HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EDWARD M. GLASMANN,

　　　　Plaintiff,

　　v.

CITY OF LAKEWOOD, WASHINGTON;
MARK EAKES and KENNETH HENSON,

　　　　Defendants.

Case No. C07-5193RBL

ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment [Dkt. #42]. The Court has reviewed the materials submitted in support of, and in opposition to, the motion. Oral argument is not necessary for the Court to resolve the issues presented in the motion. For the following reasons, defendants' motion is **GRANTED IN PART AND DENIED IN PART.**

## FACTUAL BACKGROUND

The following factual account is taken from the defendants' brief:

On October 23, 2004, Edward Glasmann was arrested by the officers of the Lakewood Police Department and the deputies of the Pierce County Sheriff's Office for Aggravated Assault, Strong Arm Robbery, Unlawful Imprisonment, and an outstanding felony warrant. During the arrest, Glasmann claims that Lakewood Officer Henson used excessive force that was "unreasonable and violated plaintiff's rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983. Amended

Complaint, p. 3, lines 5-8.

The incident involving Glasmann started during the evening of October 22, 2004 when he met his girlfriend at the time, Angel Benson ("Benson"), and two other friends for dinner to celebrate his birthday. Stellwagen Decl., Ex. 3, p. 5, ¶ 7. Benson had arrived later than expected to meet Glasmann and their friends and Glasmann was upset as a result. Glassman Dep., p. 40, lines 6-11. After dinner Glasmann and Benson returned to a nearby motel, located at 10000 block of S. Tacoma Way in Lakewood, Washington, where they were planning on spending the evening together. Stellwagen Decl., Ex. 3, p. 5, ¶ 7 and Ex. 1, p. 3, ¶ 1.

Upon returning to the motel, Glasmann and Benson began to argue at least in part because of Benson's late arrival earlier in the evening. According to Benson, they had been arguing earlier in the day as well. Stellwagen Decl., Ex. 3, p. 5, ¶ 7. In addition, "Benson said that Glasmann had been under a lot of pressure because of being in hiding from the police, and had begun using methamphetamine again within the past several months." *Id*. at p. 6, ¶ 1. At some point after their return, Glasmann's cell phone was not working and he became so upset that he threw the cell phone against the wall. *Id*.

Glasmann and Benson continued to argue and Glasmann told Benson to return some jewelry that he had previously given her. Stellwagen Decl., Ex. 3, p. 6, ¶ 2. Benson then returned a ring she was wearing and yanked a necklace off her neck, breaking the clasp, and threw it at Glasmann. *Id*. Glasmann then stated that Benson had "broken their love" and began punching and hitting Benson. *Id*. Glasmann states that Benson fought back and was slapping and hitting him. Stellwagen Decl., Ex. 10, Glasmann Dep, p. 47, lines 22-25, p. 48, lines 1-8. However, Benson states that she was unable to defend herself and was in a fetal position as Glasmann punched her in the back and back of the head. Stellwagen Decl., Ex. 3, p. 6, ¶ 2. Benson also states that Glasmann kicked her in the tailbone at some point further injuring her. Stellwagen Decl., Ex. 11, Benson Dep., pp. 36-37.

After assaulting Benson, Glasmann decided to leave the motel. Glasmann then forced Benson to go with him to his vehicle, a black Chevrolet Corvette, parked outside the room. Glasmann forced Benson into the passenger seat of the vehicle as Benson struggled to get away from him. Stellwagen Decl., Ex. 3, p. 6, ¶ 4. As Glasmann continued to forcibly push Benson into his car he caused her chest to strike the door frame at the roof of the car causing bruising on Benson's chest and sternum area. *Id*. Benson states that she was resisting and attempting to flee out of fear that Glasmann was going to try to kill them both. Benson Dep., p. 39, lines 13-25.

Eventually, Glasmann was able to force Benson into the passenger seat and close the door. Stellwagen Decl., Ex. 3, p. 6, ¶ 4.

An independent witness to this event, Erica Rusk ("Rusk"), contacted 911 and reported witnessing Glasmann assault and beat Benson up in the motel parking lot. Stellwagen Decl., Ex. 8. According to Rusk, Glasmann then forced Benson into his vehicle. As Glasmann drove away Rusk stated that she could see Benson's feet hanging from the vehicle and witnessed the car drive back and forth over Benson's legs.

Glasmann then got in the driver's seat and began to pull out of the parking spot. Stellwagen Decl., Ex. 3, p. 6, ¶ 4. Glasmann's vehicle was backed into the parking spot with the front of the car facing out and away from the motel. Glasmann Dep., p. 51, lines 5-8. As Glasmann drove away, Benson opened the passenger door and began to exit the vehicle. Stellwagen Decl., Ex. 3, p. 6, ¶ 4. Glasmann grabbed Benson attempting to keep her in the car. As a result, Benson was partially in and partially out of the vehicle as Glasmann pulled out of the parking spot. *Id*. The vehicle's rear passenger wheel then rolled over Benson's leg. Benson was screaming and yelling at Glasmann that he was running her over with the vehicle. Benson advised the police officers that Glasmann then reversed the vehicle and ran over her leg again. *Id*.

Glasmann then stopped the vehicle and put Benson into the passenger seat. He then drove the vehicle out of the parking lot and onto South Tacoma Way. Stellwagen Decl., Ex. 3, p. 6, ¶ 4. As Glasmann drove onto the street, Benson reached over and grabbed the keys from the ignition stopping the vehicle. *Id*. Benson then got out of the car and ran across the street to an AM/PM convenience store. *Id*. Glasmann exited the vehicle as well and chased after Benson leaving the vehicle in the middle of South Tacoma Way. Stellwagen Decl., Ex. 4, p. 10, ¶ 2.

The encounter between Glasmann and the Lakewood police officers began when Officers Butts and Borchardt were conducting a traffic stop of another vehicle nearby on South Tacoma Way. Stellwagen Decl., Ex. 4, p. 10, ¶ 1. While conducting that traffic stop, the Lakewood officers observed Glasmann's vehicle stop in the middle of the street with both doors open. *Id*, at p. 10, ¶ 2. The female passenger, later identified as Benson, jumped out and ran away from Glasmann's vehicle towards the parking lot of the nearby AM/PM store. The officers then witnesses Glasmann leave the vehicle and begin chasing Benson.

At that time, Officer Butts exited his vehicle and yelled twice at Glasmann to stop and come back to his vehicle. Stellwagen Decl., Ex. 4, p. 10, ¶ 3. Glasmann ignored Officer Butts and continued to run towards a vehicle parked in the AM/PM parking lot near the east end of the gas pumps. As Officer Butts followed,

Glasmann reached into his coat implying that he had a weapon and yelled that he had a gun. Officer Butts yelled at Glasmann to remove his hands from his jacket or he would be shot. Glasmann continued to move his hand back and forth inside his jacket. Glasmann then climbed into the driver's seat of the small gray vehicle in the AM/PM parking lot. Officer Butt's again yelled at him to remove his hands from his jacket or he would be shot. Glasmann responded, "Go ahead." Glasmann then attempted to start the car but there were no keys. He then reached under the passenger seat as though searching for a weapon and then did the same under the dash area. Glasmann then began reaching around in his jacket again as if he had a weapon. During this incident the driver of the gray vehicle was standing on the other side of the gas pumps and Officer Butts advised him to move back for his safety.

Glasmann then exited the passenger side of the gray vehicle and went over to a black sedan near the next set of gas pumps. Stellwagen Decl., Ex. 4, p. 10, ¶ 4. Glasmann entered the black sedan and attempted to start the vehicle causing the security alarm to sound. During this time Glasmann continued to reach into his jacket as though he had a weapon and yelled that he had a gun.

Glasmann then exited the black sedan and went to a second smaller gray vehicle on the other side of the gas pumps. Stellwagen Decl., Ex. 4, p. 10, ¶ 5. The driver of the smaller gray vehicle had finished pumping gas and was heading to the driver's seat. Glasmann shoved the driver from behind and climbed into the driver's seat. As Glasmann grabbed for the car keys, Officer Butts sprayed him with Oleo-Resin Capsicum/pepper spray. Glasmann then exited the vehicle and ran into the AM/PM store.

At that time, Lakewood, Tacoma, WSP, Steilacoom and Pierce County units arrived and began setting up a perimeter. Stellwagen Decl., Ex. 4, p. 10, ¶ 8. As the other officers set up the perimeter, the three persons whose vehicles Glasmann had entered left before the officers were able to obtain their identities.

Upon entering the store Glasmann ran to the back and hid behind a shelf. Stellwagen Decl., Ex. 4, p. 10, ¶ 6. He then removed a black item, later identified as a Pioneer remote control, from his jacket and pointed it towards the front of the store as though it were a gun. Officers Butts states that he realized at that time that it was not a gun. Officer Butts then instructed a female bystander who was in the store, and the store clerk, to both exit the store. During this time, Glasmann continued to point the remote control and yell that he had a gun.

Sergeant Eakes was also in the store at the time and attempting to get Glasmann to comply. Stellwagen Decl., Ex. 2, p. 3, ¶ 1. Sergeant Eakes recalled that Glasmann had his hand in his jacket and he "could hear him

yelling he had a 'gun'." Id. Sergeant Eakes drew his gun at that time and pointed it at Glasmann while ordering him "to show his hands and drop the gun." *Id*. Glasmann refused to comply and yelled at Sergeant Eakes to shoot him several times. *Id*. During this time Glasmann would pull his hand out of his jacket and Sergeant Eakes could see a black shiny object which he thought was possibly the butt of a gun. *Id*.

Glasmann then moved toward the front of the store and made his way behind the west side of the store counter. Stellwagen Decl., Ex. 4, p. 10, ¶ 7. Glasmann then grabbed Benson, who the officer had not realized was behind the counter, and wrapped his arm around her to hold her on the ground. Officer Butts then sprayed Glasmann with pepper spray again. In response, Glasmann began rummaging around behind the counter as though he were searching for a weapon. Stellwagen Decl., Ex. 2, p. 4, ¶ 1. Glasmann then pulled his hand back quickly and applied it to Benson's neck as though he had a knife. Glasmann was yelling that he would kill Benson and Officer Butts kept telling him to let her go. Sergeant Eakes then positioned himself near the open end of the counter area so he could continue to see Glasmann and Benson. Glasmann continued to make furtive movements reaching around under the counter area and yelling at the officers. Id. at p. 4, ¶ 2.

Officer Hamilton then moved around the west side of the counter to the right of Sergeant Eakes. Stellwagen Decl., Ex. 2, p. 4, ¶ 3. Officer Hamilton holstered his handgun and removed his Taser as he knew "that Sergeant Eakes and Officer Butts had the capacity to use lethal force if needed" because they still had their guns drawn. Stellwagen Decl., Ex. 5, p. 5, ¶ 3. At some point, Glasmann moved forward and Benson shifted away from him enough to expose a large portion of Glasmann's chest area. Officer Hamilton took advantage of this opening and applied his Taser. One of the Taser darts hit Glasmann's shoulder covered by his leather coat and the second dart hit in his denim jeans on his left thigh.

Officer Butts and several other officers then tackled Glasmann and took him to the ground behind the counter. Stellwagen Decl., Ex. 4, p. 11, ¶ 3 and Ex. 5, p. 5, ¶ 4. Glasmann still refused to cooperate and struggled with the officers while refusing to give them his hands to restrain him. The officers continued yelling at him to place his hands behind his back without a positive response. Officer Butts then placed his knees on Glasmann's back to keep him from standing up.

As Glasmann fell forward, Benson was pinned underneath Glasmann. Stellwagen Decl., Ex. 4, p. 11, ¶ 3. Sergeant Eakes, who was not in the pile, struggled to pull Benson free from underneath Glasmann. Stellwagen Decl., Ex. 2, p. 4, ¶ 5.

When the other officers converged on Glasmann behind the store counter, Officer Henson entered the building to assist. Stellwagen Decl., Ex. 1, p. 4, ¶ 1. Officer Henson witnessed Sergeant Eakes attempting to remove Benson from underneath Glasmann. Officer Henson then assisted Sergeant Eakes in removing Benson from the pile. As Benson was pulled free, Glasmann continued to struggle with the officers and Officer Henson heard the officers yelling "Get his hands! Get his hands!" Glasmann continued to struggle and refused to show his hands. At that time, Officer Henson believed that Glasmann was still armed in part based upon Sergeant Eake's radio traffic and Officer Butt's hand signals to take cover. Officer Henson also had concerns regarding the safety of the other officers due to Glasmann's close proximity to the other officers, his refusal to provide his hands and his refusal to comply with the officer's commands. As Glasmann still refused to comply with the officer's orders, Officer Henson then struck Glasmann in the back of the head four times with the bottom of his boot with medium to moderate force to gain Glasmann's compliance. Sergeant Eakes who was on the ground next to Henson then grabbed Officer Henson's leg and advised him that they had Glasmann restrained as the other officers cuffed Glasmann. Officer Henson states that he "then stopped and watched as Glasmann was cuffed."

Pierce County Sheriff Deputy Meyer's account differs slightly from Sergeant Eakes and Officer Henson's recollection. Deputy Meyer states that when he entered the store there were several officers inside the counter area "actively fighting with the suspect." Stellwagen Decl., Ex. 6, p. 3, ¶ 3. As Deputy Meyer rounded the counter he could see Sergeant Eakes attempting to free Benson from underneath Glasmann and saw Officer Henson standing near Glasmann's head with his rifle in his right hand. Deputy Meyer states that Officer Henson then struck Glasmann in the head once or twice with the bottom of his boot by raising his boot a foot or two off the ground. Deputy Meyer then grabbed Officer Henson's rifle from him so Officer Henson could approach closer and possibly use his hands to help restrain Glasmann. Stellwagen Decl., Ex. 13, Deputy Meyer Dep., pp. 39-40. At that time, Deputy Meyer states he could see blood appear on Glasmann's face and heard Sergeant Eakes telling Officer Henson to stop and grab his leg. Stellwagen Decl., Ex. 6, p. 4, ¶ 1. According to Deputy Meyer, Officer Henson did not initially respond when Sergeant Eakes advised him that they had Glasmann restrained and struck Henson three more times. Stellwagen Decl., Ex. 6, p. 4, ¶ 2. Deputy Meyer reports that he repeated "what Sergeant Eakes had been saying, 'Whoa, whoa, whoa!' and when it didn't appear that Henson could hear us I grabbed him by the back of his duty belt and pulled him

1 away from the fight."

2 Afterwards, Officer Butts and the other officers placed Glasmann in restraints and removed him from the
3 store. Stellwagen Decl., Ex. 4, p. 11, ¶ 4. Glasmann continued to yell and struggle while kicking his feet around.
4 Eventually the officers had to hog-tie Glasmann to keep him under control.

5 Glasmann has testified that he has no recollection of any events from the initial tasing until he
6 awoke in jail. Glasmann Dep., pp. 93-94.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## DISCUSSION

**A.    Qualified Immunity.**

Defendants seek dismissal of all claims against them, arguing that they are entitled to qualified immunity because the uncontroverted evidence establishes that Glasmann's constitutional rights were not violated.

Government officials are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[1] Glasmann admits that he was addicted to methamphetamine at the time of this incident and had been using on a daily basis for at least a month prior to this incident. Glasmann Dep., pp. 13-14. On the date in question Glasmann states that he had used approximately 5-7 grams of methamphetamine during the 24 hour period prior to this incident and used approximately every two or three hours to maintain a continual high. Glasmann Dep., pp. 32-33.

would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*., at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*., at 202. The privilege of qualified immunity is immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Id*.

To determine the constitutionality of a seizure, the court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696 (1983). *See also Graham v. Connor*, 490 U.S. 386, 396 (1989). In excessive force cases, the inquiry is whether the officers' conduct was "objectively reasonable under the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *Tennessee v. Garner*, 471 U.S. 1 (1985). Relevant factors in the reasonableness inquiry include, but are not limited to, (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is evading or resisting arrest. *Graham*, 490 U.S. at 396.

The Court disagrees with defendants' claim that the relevant evidence is uncontroverted. Even within defendants' own description of events there are factual differences in accounts of officers that prevent the Court from resolving the Qualified Immunity issue before trial. If Officer Henson continued to kick Glasmann after Glasmann was restrained and after fellow officers told him to stop, a reasonable jury could conclude that Henson's use of force was excessive. A jury will make that determination based on the evidence adduced at trial. If excessive force was used, a constitutional right was violated and that right

was clearly established before the events giving rise to this action.

The case against Sergeant Eakes is particularly skinny but the Court cannot conclude from the evidence before it that Sgt. Eakes is entitled to Qualified Immunity as a matter of law. To his credit, Sgt. Eakes acted to stop Henson from beating Glasmann after Glasmann was restrained. The fact that Henson did not stop when his supervisor instructed him raises the question whether a reasonable jury could conclude that Eakes' "intervention" was less than enthusiastic or sincere. The fact that Eakes does not include within his report any mention of Henson being directed to desist and ignoring that command from Eakes, may provide some credibility to plaintiff's theory of liability against Sgt. Eakes.

## B. Assault and Battery Claim.

Defendant Henson seeks dismissal of the state tort claims of assault and battery on the basis of qualified immunity under state law. An officer has state law qualified immunity from suit where the officer (1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably. *Staats v. Brown*, 139 Wn.2d 757, 778 (2000). For reasons stated above, the question of whether Officer Henson acted reasonably under the circumstances is a question of fact for the jury and will not be decided by the Court in a summary judgment motion.

## C. Statutory Immunity.

The individual officers argue for statutory immunity under RCW 10.99.070. That statute provides:

> A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission on good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident.

RCW 10.99.070. Inasmuch as the Court has already opined that issues of fact create a jury question regarding the reasonableness of the officers' conduct with regard to Mr. Glasmann, so too, the jury will have to decide the issue of good faith conduct under the statute. The two issues are inexorably intertwined.

## D. *Monell* Liability.

The City of Lakewood seeks judgment as a matter of law on plaintiff's municipal liability claim. A plaintiff alleging liability of a municipality for civil rights violations must prove three elements: (1) a violation of his/her constitutional rights, (2) the existence of a municipal policy or custom of the

municipality, and (3) a causal nexus between the policy or custom and the constitutional violation. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).

In opposing this part of defendants' motion, the plaintiff has failed to present any evidence of a municipal policy, custom or practice that encouraged, promoted or otherwise tolerated the use of excessive force by its police officers when effecting the arrest of a citizen. Absent some evidence tending to support the existence of such a policy, the claim against the City of Lakewood cannot be maintained. The claim against the City of Lakewood is **DISMISSED**.

## **CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment [Dkt. #42] as to the individual officers is **DENIED.** The Motion as to the City of Lakewood is **GRANTED**.

Dated this 6th day of January, 2009.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE